******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ERICA LAFFERTY ET AL. *v.* ALEX EMRIC JONES ET AL.
## (AC 48621)

Cradle, C. J., and Suarez and DiPentima, Js.

*Syllabus*

The plaintiff in error, counsel of record for the defendants in underlying consolidated tort actions, filed a writ of error challenging the trial court's order suspending him from the practice of law for a period of two weeks for violating the Rules of Professional Conduct. He claimed that the court's disciplinary order constituted an abuse of its discretion. *Held*:

The trial court acted within its discretion in suspending the plaintiff in error from the practice of law for a period of two weeks, as the record revealed that the court carefully considered the facts relevant to its determination of an appropriate sanction, including various aggravating and mitigating factors, and, contrary to the plaintiff in error's contention, for which he cited no appellate authority, the court was not obligated to follow the American Bar Association's Standards for Imposing Lawyer Sanctions, guidelines that have not been formally adopted by the judges of this state.

Argued October 23—officially released December 16, 2025

*Procedural History*

Writ of error from the order of the Superior Court in the judicial district of Waterbury, Complex Litigation Docket, *Wilson, J.*, suspending the plaintiff in error from the practice of law for a period of two weeks. *Writ denied.*

*Christopher T. DeMatteo*, for the appellant (plaintiff in error Norman A. Pattis).

*Brian B. Staines*, chief disciplinary counsel, for the appellee (defendant in error Office of Chief Disciplinary Counsel).

*Opinion*

SUAREZ, J. The plaintiff in error, Norman A. Pattis, a Connecticut attorney and counsel of record for the

defendants, Alex Emric Jones and Free Speech Systems, LLC,[1] in the underlying consolidated tort actions[2] arising out of the mass shooting at Sandy Hook Elementary School, filed the present writ of error challenging the order of the trial court suspending him from the practice of law for a period of two weeks for violating the Rules of Professional Conduct (rules). Pattis claims that the court's disciplinary order constituted an abuse of its discretion. We reject this claim and, accordingly, deny the writ of error.[3]

The following facts and procedural history, as set forth by the trial court in its decision, as set forth by this court in prior decisions, or as are undisputed in the record, are relevant to our resolution of this writ of error. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook,

---

[1] Although there were additional defendants who participated in the underlying actions, Jones and Free Speech Systems, LLC, were the only remaining defendants at all times relevant to the present appeal. We therefore refer in this opinion to Jones and Free Speech Systems, LLC, as the defendants.

[2] The consolidated actions are *Lafferty* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S; *Sherlach* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046437-S; and *Sherlach* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046438-S.

[3] The present writ of error was filed against the defendant in error, the Office of Chief Disciplinary Counsel. This court previously determined that the defendant in error was a proper party to defend the trial court's disciplinary order. See *Lafferty* v. *Jones*, 220 Conn. App. 724, 729–30, 299 A.3d 1161 (2023).

and a school psychologist who were killed in the shoot-ing,[4] brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold them-selves out as news and journalism platforms. The plain-tiffs further alleged that [Jones] began publishing con-tent related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and sub-scribers. The complaints each consisted of five counts, including causes of action sounding in invasion of pri-vacy by false light, defamation and defamation per se,

---

[4] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Alden-berg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, in her place as a plaintiff in this case. *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini." *Lafferty* v. *Jones*, 225 Conn. App. 552, 558–59 n.3, 316 A.3d 742 (2024).

intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. . . .

"[O]n February 22, 2019, the court granted [a] motion for protective order filed by the Jones defendants, which allowed, inter alia, the plaintiffs' medical and/or mental health records to be designated as confidential.[5] The court order limited the use of such confidential information.[6] On June 16, 2021, the court granted, without objection, the plaintiffs' motion to modify the protective order to create a Highly Confidential-Attorneys

---

[5] "The order limited access to confidential information to the following individuals in this case and all cases consolidated with this case: All counsel of record, including staff persons employed by such counsel; the parties, but only to the extent reasonably necessary to the litigation of this case; any consultant, investigator or expert (collectively Expert) who is assisting in the preparation and/or trial of this action, but only to the extent reasonably necessary to enable such Expert to render such assistance; any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness; court reporters, videographers and outside vendors performing litigation support services for parties in this case; counsel who are presently representing clients in a case against any one or more of the [Jones] Defendants, which arises out of the same or similar set of facts, transactions or occurrences, provided that before disclosing Confidential Information to such counsel, such Defendant (1) must receive notice of the intention to disclose Confidential Information to such counsel; (2) must have the opportunity to move for a protective order in the case in which counsel is involved; and (3) a ruling on the motion for protective order must be issued; and the Court and its personnel." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 225 Conn. App. 552, 560 n.6, 316 A.3d 742 (2024).

[6] "The protective order stated as follows: Except to the extent expressly authorized by this Protective Order, Confidential Information shall not be used or disclosed for any purpose other than the preparation and trial of this case, all cases consolidated with this case, and in any appeal taken from any order or judgment herein. This Limitations on Use provision can be found in the subsequent modifications to the protective order." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 225 Conn. App. 552, 560 n.7, 316 A.3d 742 (2024).

Eyes Only designation.[7] Finally, on June 15, 2022, the court granted by consent a final modification to the order of protection, adding sensitive information of parties or witnesses, which is ordinarily kept confidential as a category of information which could be designated as confidential.[8] All . . . versions of the protective order required that (a)ll persons having access to Confidential Information to maintain it in a safe and secure

[7] "The modified protective order limited access to Highly Confidential-Attorneys Eyes [Only] information to counsel of record, and staff persons employed by such counsel who reasonably need to handle such information; outside consulting experts or testifying expert witnesses, but only to the extent reasonably necessary; any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness, and only to the extent such questioning is reasonably necessary; court reporters, videographers and outside vendors performing litigation support services for parties in this case; and the court and its personnel. The only sharing provision in the order allowed (c)ounsel who are presently representing clients in a case against any one or more of the [Jones] defendants to share confidential information with each other, that is, counsel representing plaintiffs in cases against a Jones defendant." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 225 Conn. App. 552, 560–61 n.9, 316 A.3d 742 (2024).

[8] "The order limited access to Highly Confidential-Attorneys Eyes Only information to the same individuals as the prior order, adding the words in this action to further define counsel of record: a. Counsel of record in this action, and staff persons employed by such counsel who reasonably need to handle such information; b. Outside consulting experts or testifying expert witnesses, but only to the extent reasonably necessary. Any Party choosing to show such material to such expert shall have the duty to reasonably ensure that such person observes the terms of this Protective Order and shall be responsible upon breach of such duty for the failure of such person to observe the terms of this Protective Order; c. Any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness, and only to the extent such questioning is reasonably necessary; d. Court reporters, videographers and outside vendors performing litigation support services for parties in this case; and The Court and its personnel. No such information shall be disclosed to any other party or person." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 225 Conn. App. 552, 561 n.12, 316 A.3d 742 (2024).

manner." (Citation omitted; footnotes in original; footnotes omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, 225 Conn. App. 552, 558–61, 316 A.3d 742 (2024).

The following abbreviated recitation of the factual and procedural background relating to Pattis' disclosure of the plaintiffs' confidential information, as set forth previously by this court, is relevant. "Utilizing a database management firm to ensure that discovery materials were protected and secure, the plaintiffs, beginning in October of 2021, began a rolling [discovery] production. . . . Medical records, deposition transcripts, and employment, financial, and professional records were among the records of the plaintiffs that were designated [pursuant to the protective order] as Highly Confidential-Attorneys Eyes Only. . . .

"The concerns of the court with protecting the plaintiffs' medical and confidential information were made painfully clear to [Pattis] early in the discovery process, when [on July 1, 2021] he filed a motion to depose Hillary Clinton, improperly using information designated as Highly Confidential-Attorneys Eyes Only. . . . Beginning in June of 2021, both the court and the plaintiffs clearly expressed their concerns with respect to protecting the plaintiffs' mental health and other medical and confidential information.

"In late February of 2022, [Pattis] contacted [Federico Andino] Reynal, a Texas attorney, regarding Reynal's potential representation of Jones and related defendants in five cases pending in Texas. The expectation was that Reynal would also be working on the three consolidated Connecticut cases, and that the two would collaborate on the Texas and Connecticut cases. In March of 2022, approximately six weeks prior to the then trial date in Texas, Reynal filed an appearance in the Texas Sandy Hook defamation lawsuit brought by

Scarlett Lewis and Neil Heslin (Texas case). Reynal was the tenth lawyer for the Jones defendants in the Texas case, initially appearing as cocounsel with Jacquelyn Blott. Blott gave Reynal the files for all five of the Jones defendants' pending Texas cases. . . . Neither Reynal nor his office ever requested from [Pattis], or from anyone else, the . . . plaintiffs' medical, tax, employment or financial records. . . .

"On April 13 [and] 14, 2022, emails were exchanged between [Pattis], Texas attorney [Kyung S.] Lee, and [prior counsel for the Jones defendants in the underlying consolidated actions, Jay] Wolman, regarding Randazza emails.[9] On April 17, 2022, on the eve of trial in the Texas case, Lee filed a petition for bankruptcy on behalf of [Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC] in the [United States Bankruptcy Court for the Southern District of Texas] . . . .

"On May 2, 2022, Lee emailed Wolman and [Marc] Randazza . . . reporting that Reynal and [Shelby] Jordan had provided him with the discovery in the Texas case, and stating that, when he had asked [Pattis] and [his associate Cameron] Atkinson about the Connecticut discovery, Atkinson recommended that Lee contact Wolman and Randazza directly, as the transfer [of the Connecticut discovery] from Wolman and Randazza to [Pattis] and Atkinson was corrupted. Lee asked Wolman to provide him with all the Connecticut discovery by and for each side, in light of the changing number of lawyers representing the Jones defendants and the status of discovery in both Texas and Connecticut. . . .

"Half an hour later, Wolman responded to Lee by email, stating that, on March 28, 2022, he had given

---

[9] "Marc Randazza is an attorney admitted in Nevada whose application for pro hac vice [admission] in the Connecticut cases was denied by the court on July 7, 2020. Randazza and a Shelby Jordan were copied on the emails." *Lafferty* v. *Jones*, supra, 225 Conn. App. 582 n.34.

Atkinson a new [hard] drive with several hundred giga-bytes, which Atkinson confirmed worked. Wolman suggested that Atkinson's office FedEx the hard drive to Lee and noted that Lee would need to get the . . . plaintiffs' recent compliance from [Pattis'] team. . . . Wolman emailed Lee again, copying the same five individuals, including [Pattis] and Atkinson, warning that, in light of th[e] court's protective order, Lee might not be authorized to access the . . . plaintiffs' confidential documents.

"Lee responded to Wolman five minutes later, copying the same five individuals, including [Pattis] and Atkinson, thanking Wolman and confirming that he would look into the confidentiality situation in the Connecticut litigation. A few minutes later, Lee emailed [Adam] Rodriguez, asking him to locate the confidentiality order, and asking [Pattis] and Atkinson if they knew what Wolman was referring to. Shortly thereafter, Lee responded to Wolman's email, confirming that he would follow through with Atkinson and [Pattis]. Later that morning, Rodriguez emailed Lee, (copying Atkinson, [Pattis], [Marc] Schwartz, [Robert J.] Shannon, [Raymond] Battaglia, and Jordan), attaching the Connecticut protective orders and highlighting the Highly Confidential-Attorneys Eyes Only language.

"Neither [Pattis] nor anyone from his firm advised of the existence of the protective order, asked Lee to sign a confidentiality order, or responded to Wolman's warning or Lee's inquiry about the protective order. Similarly, neither [Pattis] nor anyone from his firm informed Lee that they were sending him the . . . plaintiffs' mental health records, medical records, or other such sensitive information. Instead, shortly after this May 2, 2022 email exchange, Lee received at his Houston [Texas] office a white external hard drive in a bubble wrap envelope, along with an undated cover letter from Atkinson to Lee, enclosing the hard drive—

the same hard drive that [Pattis] and Atkinson had obtained from Randazza and Wolman. Neither the envelope nor the hard drive was designated or marked in any way as confidential or protected by court order, despite the fact that the hard drive contained the . . . plaintiffs' [confidential information]. . . .

"Sometime between June 1 [and] 15, 2022 . . . Lee handed the hard drive, unmarked, unaltered, and with no envelope, to Reynal. It did not occur to Lee to inform Reynal that the hard drive contained the . . . plaintiffs' [confidential information], and Reynal was not asked to sign any confidentiality agreement. . . . [A]bsolutely no care was taken to safeguard the information or to document the details of the transfer of the hard drive. . . . On June 15, 2022, Atkinson emailed Lee, asking Lee to make the [hard drive] available to Reynal. Lee responded by saying that he had already given it to Reynal. A day or two later, at the request of [Pattis'] office, Reynal had the hard drive shipped back to [Pattis]. Thus, the . . . plaintiffs' sensitive information, which should have been safeguarded and which was also protected by the court order, was carelessly passed around from one unauthorized person to another, without regard for the protective order, and with no effort to safeguard the . . . plaintiffs' sensitive, confidential documents. The confidential, court-protected medical and other records of the . . . plaintiffs were improperly and unsafely transmitted at the direction of [Pattis] to Lee, and then improperly and unsafely transferred by Lee to Reynal, with [Pattis'] approval.

"On July 6, 2022, [Pattis] filed an application for Reynal to appear pro hac vice in the Connecticut cases. The application was granted on July 20, 2022, with certain restrictions and the requirement that Reynal file an appearance by July 30, 2022. On July 26, 2022, the court granted [Pattis'] oral motion to withdraw Reynal's pro hac admission, before Reynal filed his appearance.

"In the meantime, on July 22, 2022, Reynal's assistant, at his request, emailed Mark Bankston, lead counsel [for the plaintiffs] in the Texas case, with a link to a gofile.me archive containing supplemental production. However, the link that was sent mistakenly provided access to other materials, including Jones' previously undisclosed text messages, as well as the . . . plaintiffs' Highly Confidential-Attorneys Eyes Only medical records and discovery. The directory consisted of an unusually large number of highly disorganized folders and files. Bankston, having concluded that the materials contained the . . . plaintiffs' confidential documents, as well as [Pattis'] work product, stopped his review and emailed Reynal, alerting Reynal that the documents appeared to include records of the . . . plaintiffs and confidential and work product documents." (Footnote in original; footnotes omitted; internal quotation marks omitted.) Id., 579–86.

On August 3, 2022, the plaintiffs' counsel in the Connecticut action, Christopher M. Mattei, " 'emailed Reynal regarding Reynal's disclosure to Bankston . . . requesting that Reynal provide him with an itemized list of the documents, the date he received them, the identity of anyone who had access to them, and confirmation of their destruction. An hour after that email, [Pattis] texted Mattei, stating, "Chris. Give me a call. I learned moments ago that my office may have violated protective order. Norm." ' " (Footnote omitted.) Id., 587–88.

On January 5, 2023, after a show cause hearing, the court, *Bellis*, *J.*, issued a memorandum of decision, determining, by clear and convincing evidence, that Pattis had violated rules 1.1, 1.15 (b), 3.4 (3), 5.1 (b), 5.1 (c), and 8.4 (4) of the Rules of Professional Conduct. Id., 563. As discipline, the court suspended Pattis from

the practice of law for a period of six months.[10] Id. The plaintiff filed a writ of error (first writ of error) contesting the court's findings. Id.

On appeal, this court granted in part the first writ of error. Id., 611. This court held that the trial court correctly concluded that Pattis violated rules 1.1, 5.1 (b), 5.1 (c) in part, and 8.4 (4) of the Rules of Professional Conduct.[11] Id., 579. This court concluded, however, that the trial court incorrectly determined that Pattis violated rules 1.15 (b), 3.4 (3), and 5.1 (c) in part, of the Rules of Professional Conduct.[12] Id. Accordingly, this court ordered that the case be remanded with direction to vacate the trial court's findings that Pattis violated rules 1.15 (b), 3.4 (3), and 5.1 (c) in part, as well as the court's disciplinary order, and remanded the case for a new hearing on sanctions before a different judge. Id., 611.

---

[10] The court's January 5, 2023 suspension order was stayed pending the resolution of Pattis' first writ of error. *Lafferty* v. *Jones*, 220 Conn. App. 724, 726–27 n.4, 299 A.3d 1161 (2023).

[11] This court concluded that the trial court properly applied (1) rule 1.1 of the Rules of Professional Conduct in concluding that Pattis did not appropriately safeguard sensitive discovery materials; *Lafferty* v. *Jones*, supra, 225 Conn. App. 595–96; (2) rule 5.1 (b) and rule 5.1 (c) in part in concluding that Pattis did not make reasonable efforts to supervise Atkinson; id., 607; and (3) rule 8.4 (4) in concluding that Pattis' misconduct "unilaterally imposed a significant cost on the plaintiffs in their attempt to obtain justice in this matter." Id., 610.

[12] Specifically, this court determined that the trial court improperly applied (1) rule 1.15 (b) of the Rules of Professional Conduct because discovery materials, like the plaintiffs' confidential records, were not encompassed by rule 1.15 (b); *Lafferty* v. *Jones*, supra, 225 Conn. App. 598; (2) rule 3.4 (3) because the evidence did not support the court's finding by clear and convincing evidence that Pattis "knowingly" violated the protective order; id., 604; and (3) rule 5.1 (c) in part because this court concluded that, as to the claim that Pattis violated rule 5.1 (c) in acting as Reynal's sponsoring attorney in Connecticut, there was no evidence demonstrating that Pattis either gave Reynal any directions regarding the plaintiffs' confidential records, or that he had "ratified Reynal's conduct with knowledge thereof." Id., 608.

On October 24, 2024, the court, *Wilson, J.*, held a disciplinary hearing on sanctions in accordance with this court's remand order. At the hearing, the court heard testimony from Pattis and admitted into evidence several documentary exhibits, which included, inter alia, a letter signed by Brittany Paz, Pattis' law partner, as well as transcripts of testimony from several character witnesses who testified at the previous show cause hearing. The parties thereafter filed posthearing briefs.[13]

On March 12, 2025, the court issued a memorandum of decision in which it ordered that the plaintiff be suspended from the practice of law for a period of two weeks. The court reasoned that the duties implicated to the plaintiffs and the legal system are "important" ones. The court stated that, given the highly litigious nature of the present case, Pattis should have been on "heightened alert and duty" that the plaintiffs' confidential information had to be handled with the utmost care. In addition to the actual harm the plaintiffs suffered, the court noted that the potential harm was "stunning," as the unauthorized disclosures were revealed on the record in a public trial in Texas and "easily could have been made part of the record in the Texas case, or otherwise disseminated . . . ."

In issuing its order of suspension, the court found the following as aggravating factors: (1) a prior attorney grievance[14] that was filed against Pattis arising out of the present litigation; (2) the vulnerability of the victims, which the court considered to be the "most compelling" aggravating factor; and (3) Pattis' substantial experience in the practice of law. As mitigating factors, the

---

[13] In its posthearing brief, the defendant in error recommended a suspension of thirty days.

[14] This grievance complaint was ultimately dismissed. The Statewide Grievance Committee found that Pattis' conduct did not amount to an ethical violation, however, it found that his execution of an affidavit on behalf of Jones in relation to the underlying cases was "sloppy" and that he "exercised bad judgment."

court noted (1) Pattis' lack of disciplinary history; (2) the absence of a dishonest or selfish motive; (3) Pattis' initial disclosure of the errors to the plaintiffs' counsel, with respect to which the court afforded Pattis "minimal credit"; and (4) Pattis' remorsefulness.[15] The court concluded that there was "simply no excuse for Pattis' misconduct."[16]

This writ of error followed. In his writ of error, Pattis does not challenge any of the underlying facts or findings of violations. Rather, Pattis claims that the court, *Wilson, J.*, abused its discretion when it suspended him for two weeks for violating rules 1.1, 5.1 (b), 5.1 (c) in part, and 8.4 (4) of the Rules of Professional Conduct.[17] He argues, inter alia,[18] that (1) Judge Wilson's order of

[15] At the October 24, 2024 hearing, Pattis testified that the records disclosure issue was "personally devastating" to him.

[16] On March 18, 2025, Pattis filed a motion for clarification in which he requested that the court clarify its order to state that seven days of his prior suspension, which he already had served in January, 2023, be credited toward the current suspension, rendering a remainder of seven days. The court agreed and ordered that Pattis "receive credit for seven days already served against the two week suspension order . . . ."

Pattis also filed a motion for stay of the court's disciplinary order, which the court denied. On July 9, 2025, this court granted Pattis' motion for review of the denial of his motion for a stay of his suspension and granted the relief requested "in that the March 12, 2025 order suspending . . . Pattis from the practice of law is stayed pending the final resolution of this writ of error."

[17] In arguing that the court's suspension order was "arbitrary," Pattis argues that "an attorney who is subject to a disciplinary proceeding is entitled to due process." To the extent that Pattis intended to raise a separate claim that the court violated his due process rights, that claim is inadequately briefed. See, e.g., *Clark* v. *Employees' Review Board*, 234 Conn. App. 554, 571 n.18, 344 A.3d 545 (2025) ("[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)).

[18] Pattis also argues that the court's "arbitrariness in deciding to suspend [him] is evident by the fact that it did not discipline Reynal at all, even though it found misconduct on [Reynal's] part for the same course of events, albeit for different violations." This argument merits little discussion. The factual basis for the rule violations with respect to Reynal and Pattis was

suspension improperly deviated from the American Bar Association's Standards for Imposing Lawyer Sanctions (ABA standards), and (2) the court improperly weighed the aggravating and mitigating factors delineated in the ABA standards in concluding that a suspension, rather than a reprimand, was warranted. We disagree.

"[T]he trial court possesses inherent judicial power, derived from judicial responsibility for the administration of justice, to exercise sound discretion to determine what sanction to impose in light of the entire record before it. . . . It is well established that in sanctioning an attorney for violations of the [rules], courts are, as they should be, left free to act as may in each case seem best in this matter of most important concern to them and to the administration of justice. . . . Whether this court would have imposed a different sanction is not relevant. Rather, we must determine whether the trial court abused its discretion in determining the nature of the sanction. . . . We may reverse the court's decision [in sanctioning an attorney] only if that decision was unreasonable, unconscionable or arbitrary, and was made without proper consideration of the facts and law pertaining to the matter submitted." (Internal quotation marks omitted.) *Mills* v. *Statewide Grievance Committee*, 228 Conn. App. 852, 866, 326 A.3d 309 (2024), cert. granted, 351 Conn. 903,

different. In its January 17, 2023 memorandum of decision, issued after a show cause hearing as to Reynal's conduct, the court, *Bellis, J.*, noted that Reynal, unlike Pattis, was "prohibited from possessing the Connecticut plaintiffs' medical records and other Highly Confidential-Attorneys Eyes Only materials as he was not an attorney of record in the Connecticut cases." Judge Bellis did not sanction Reynal, noting the "impressive number of important mitigating factors that militate[d] in his favor," including the fact that Reynal had traveled voluntarily from Texas to appear for his show cause hearing. We cannot conclude, given the distinguishing facts underlying the alleged rule violations vis-à-vis Pattis and Reynal, and given the broad discretion afforded to the court in determining an appropriate disciplinary sanction, that Judge Wilson's two week suspension order as to Pattis was arbitrary.

329 A.3d 240 (2025). If a court disciplines an attorney, "it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." (Internal quotation marks omitted.) *Disciplinary Counsel* v. *Serafinowicz*, 160 Conn. App. 92, 98, 123 A.3d 1279, cert. denied, 319 Conn. 953, 125 A.3d 531 (2015).

"The court has discretion to view the totality of the circumstances when determining the appropriate discipline. Further, under the abuse of discretion standard of review, [e]very reasonable presumption should be given in factor of the correctness of the court's ruling. . . . Absent a showing that the trial court has acted arbitrarily, we defer to the trial court's determination of the appropriate discipline." (Citation omitted; internal quotation marks omitted.) *Office of Chief Disciplinary Counsel* v. *Vaccaro*, 226 Conn. App. 75, 97, 317 A.3d 785, cert. granted, 350 Conn. 907, 323 A.3d 1092 (2024).

"Courts considering sanctions against attorneys measure the [attorney's] conduct against the [rules]. Although the rules define misconduct, they do not provide guidance for determining what sanctions are appropriate. . . . Connecticut courts reviewing attorney misconduct, therefore, have consulted the . . . [ABA standards] . . . . Although the [ABA] standards have not been officially adopted in Connecticut, they are used frequently by the Superior Court in evaluating attorney misconduct and in determining discipline . . . . [A]fter a finding of misconduct, a court should consider: (1) the nature of the duty violated; (2) the attorney's mental state; (3) the potential or actual injury stemming from the attorney's misconduct; and (4) the existence of aggravating or [mitigating] factors. . . .

"The ABA [s]tandards list aggravating factors as follows. Aggravating factors include: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; [and] (k) illegal conduct, including that involving the use of controlled substances. A.B.A., Annotated Standards for Imposing Lawyer Sanctions (2019) standard 9.22, p. 451. The standards also list the following as mitigating factors: (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency . . . (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (*l*) remorse; [and] (m) remoteness of prior offenses. . . . A.B.A., Annotated Standards for Imposing Lawyer Sanctions (2019) standard 9.32, p. 487." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Office of Chief Disciplinary Counsel* v. *Vaccaro*, supra, 226 Conn. App. 91–93.

Although the ABA standards are frequently used as a guide for courts in determining appropriate discipline, "[t]he [ABA] [s]tandards, originally promulgated in 1986, have not formally been adopted by the judges of this state. . . . Accordingly, although a court should

consider . . . the existence of aggravating or mitigating factors . . . there is no express requirement that it do so. Further, even when a court is provided with relevant mitigating evidence, it is free to reject that evidence. . . . The court was free to credit or reject [the evidence presented] as well as to exercise its discretion in considering evidence that might be irrelevant or cumulative. . . . [T]here is no requirement that the court set forth its express consideration of [specific] evidence in its memorandum of decision . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Mills* v. *Statewide Grievance Committee*, supra, 228 Conn. App. 867.

First, Pattis argues that the court should have applied ABA standards 4.53, 6.23, and 7.3, and issued him only a reprimand, rather than a two week suspension.[19] The court, however, was not obligated to follow the disciplinary recommendations delineated in the ABA standards, because those guidelines have not formally been adopted by the judges of this state.[20] *Mills* v. *Statewide*

---

[19] Standard 4.53 provides in relevant part that reprimand is generally appropriate when a lawyer "(a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client . . . ." A.B.A., Annotated Standards for Imposing Lawyer Sanctions (2019) standard 4.53.

Standard 6.23 provides that "[r]eprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding." A.B.A., Annotated Standards for Imposing Lawyer Sanctions (2019) standard 6.23.

Standard 7.3 provides that "[r]eprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." A.B.A., Annotated Standards for Imposing Lawyer Sanctions (2019) standard 7.3.

[20] In his reply brief, Pattis analogizes the ABA standards to the guidelines relating to child support, and case law applying those guidelines. Those cases are distinguishable because compliance with the child support guidelines is mandatory except in the limited circumstances when, pursuant to General Statutes § 46b-215b, a court orders a deviation from the child support guidelines on the basis of "[a] specific finding . . . that the application of the guidelines would be inequitable or inappropriate in a particular case . . . ."

*Grievance Committee*, supra, 228 Conn. App. 866–67. Indeed, Pattis has not cited to any appellate authority, and we are not aware of any, in which this court, or our Supreme Court, has concluded that a trial court abused its discretion in issuing a disciplinary order because the court had departed from the ABA standards.[21] Furthermore, as in *Mills*, there was no indication in the present case "that the court did *not* take the

---

By contrast, because, as discussed herein, our legislature has not codified the ABA standards, and the judges of this state have not adopted them, compliance with those standards is not mandatory.

[21] In his reply brief, Pattis relies on *Manookian* v. *Board of Professional Responsibility of the Supreme Court of Tennessee*, 685 S.W.3d 744, 808 (Tenn.), cert. denied,      U.S.      , 145 S. Ct. 160, 220 L. Ed. 2d 23 (2024), for the proposition that the ABA standards were intended to "promote . . . consistency" in attorney discipline. (Internal quotation marks omitted.) In that case, the Tennessee Supreme Court concluded that a downward deviation from the ABA standards was arbitrary and capricious because the Board of Professional Responsibility hearing panel had not stated its reasoning for the lesser sanction and because the panel's decision "disregard[ed] the facts and circumstances of [the] case without any basis that would lead a reasonable person to do the same." Id., 809. Although we agree that the ABA standards were meant to promote consistency in attorney discipline, Pattis ignores that the ABA standards are also intended to constitute a "*model*, setting forth a comprehensive system for determining sanctions, permitting *flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct.*" (Emphasis added; internal quotation marks omitted.) Id., 808; see A.B.A., Annotated Standards for Imposing Lawyer Sanctions (2019) standard 1.3.

*Manookian* also is legally and factually distinguishable. First, the Tennessee Supreme Court Rules provide that, "[i]n determining the appropriate type of discipline, the hearing panel *shall* consider the applicable provisions of the ABA [standards]. Tenn. Sup. Ct. R. 9, § 15.4 (a)." (Emphasis added; internal quotation marks omitted.) *Manookian* v. *Board of Professional Responsibility of the Supreme Court of Tennessee*, supra, 685 S.W.3d 775 n.42. The judges of this state have not adopted any such rule. Second, in the present case, unlike in *Manookian*, the court, *Wilson, J.*, comprehensively set forth the reasoning of its decision and did not "disregard" the facts of the present case. To the contrary, Judge Wilson emphasized the unique facts of the underlying cases, stating that Pattis' "breach of [his] duty should be observed in the context of the litigation," in which the plaintiffs sought redress for the defendants' personal attacks in a "hotly contested" case, and found that the plaintiffs suffered actual and potential harm as a result of his misconduct.

ABA standards into account in reaching its decision." (Emphasis in original.) Id., 867. The court, acting within its broad discretion, cited to the ABA standards and made specific findings regarding the aggravating and mitigating factors that it found were most relevant. See, e.g., id. ("there is no requirement that the court set forth its express consideration of [specific] evidence in its memorandum of decision" (internal quotation marks omitted)). On the basis of those findings, the court issued its two week suspension order. Contrary to Pattis' argument, the imposition of sanctions "should be individualized and tailored to the facts of the particular case. Indeed, the ABA standards on which [Pattis] relies, and which serve as a guide for imposing discipline, reflect that goal." *Disciplinary Counsel* v. *Serafinowicz*, supra, 160 Conn. App. 102.

Second, Pattis argues that the court should have weighed the evidence as to aggravating and mitigating factors differently than it did. Pattis essentially invites us to reweigh the evidence so that we might reach a conclusion that differs from the one reached by the court. We decline his invitation. See, e.g., *In re Kylie P.*, 218 Conn. App. 85, 113, 291 A.3d 158 (declining to reweigh evidence on appeal), cert. denied, 346 Conn. 926, 295 A.3d 419 (2023). This court has previously stated that "our opinion as to what should have been the appropriate sanction for the defendant is not at issue." *Statewide Grievance Committee* v. *Glass*, 46 Conn. App. 472, 479, 699 A.2d 1058 (1997); see also *Briggs* v. *McWeeny*, 260 Conn. 296, 335, 796 A.2d 516 (2002) ("[i]n matters of attorney misconduct, [the trial] court is free to determine in each case, as may seem best in light of the entire record before it, whether a sanction is appropriate and, if so, *what the sanction should be*" (emphasis in original; internal quotation marks omitted)). As this court also has explained, "[t]he

abuse of discretion standard is such that it usually precludes the overturning of a trial court's judgment in such cases." *Statewide Grievance Committee* v. *Glass*, supra, 479.

In the present case, the record reveals that the court carefully considered the facts relevant to its determination of an appropriate sanction. The court noted the "important" duties implicated in the present case with respect to the underlying plaintiffs and the legal system. The court agreed with the defendant in error, the Office of Chief Disciplinary Counsel, that Pattis' breach "should be observed in the context of the litigation; here, the plaintiffs were seeking redress against the defendants for personal attacks in a hotly contested case." The court found that there was "clearly actual and potential harm stemming from Pattis' misconduct." As noted previously in this opinion, the court cited to the ABA standards and weighed the aggravating and mitigating factors, finding that the vulnerability of the victims was the "most compelling aggravating factor based on the nature of the civil action." The court also cited as aggravating factors the fact that Pattis was the subject of a prior grievance arising out of the present litigation, and the fact that Pattis was an experienced attorney.[22] The court stated that, as a "well-known attorney who handles high profile cases on a regular basis,"

[22] We are not convinced by Pattis' argument that the trial court should not have considered a dismissed grievance complaint, which previously was filed against him in relation to the underlying consolidated cases, as an aggravating factor. Pattis argues that "[t]he dismissed grievance does not fall within the aggravating factors recommended by the ABA and approved by our Supreme Court in *Burton* [v. *Mottolese*, 267 Conn. 1, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004)]." Our Supreme Court in *Burton*, however, did not state that the ABA standards are the exclusive factors that may be relied on by a court in determining an appropriate disciplinary sanction of an attorney. See id., 55 and n.50. We cannot conclude that the trial court improperly relied on the Statewide Grievance Committee's statement that Pattis exercised "bad judgment" in relation to the underlying cases, even though the grievance complaint was ultimately dismissed. See footnote 14 of this opinion. See, e.g., *Statewide*

he was required to appreciate the consequences of his actions when he released the plaintiffs' discovery. The court weighed the mitigating factors, affording Pattis credit for his remorsefulness at the postremand hearing. The court also credited Pattis' lack of a prior disciplinary record, the absence of any dishonest motive, and afforded him "minimal" credit for disclosing the issue to the plaintiffs' counsel, although the court determined that this disclosure "fell far short."

We therefore are not convinced by Pattis' argument that "[t]he aggravating factors, even including the dismissed grievance, are outnumbered and outweighed by the mitigating factors." Pattis has not offered any authority for the proposition that the number of mitigating and/or aggravating factors listed by the trial court should be dispositive. Further, Pattis asserts that his lack of any prior disciplinary history over the course of nearly thirty years of practice "should have been given enough weight on its own to prevent an upward disciplinary departure." Pattis also argues that the court did not consider his character, including the testimony of his character witnesses, which was in evidence, and his interim rehabilitation. There is no indication, however, that the court failed to consider this evidence, and the court was not required to "set forth its express consideration of [specific] evidence in its memorandum of decision . . . ." (Internal quotation marks omitted.) *Mills* v. *Statewide Grievance Committee*, supra, 228 Conn. App. 867; see also, e.g., *Statewide Grievance Committee* v. *Spirer*, 247 Conn. 762, 788, 725 A.2d 948 (1999) (rejecting plaintiff's argument that trial court failed to consider evidence when court did not specifically refer to that evidence in its memoranda of decision). Given the gravity of the interests involved in the

*Grievance Committee* v. *Shluger*, 230 Conn. 668, 677–78, 646 A.2d 781 (1994) (evidence of prior reprimands was admissible at disciplinary proceeding because it bore "reasonable relation to the issues before it").

underlying cases and the vulnerability of the plaintiffs, which the court found was the most compelling aggravating factor, we cannot say that the court ignored the evidence of mitigating factors in issuing a two week suspension. Accordingly, we conclude that the trial court acted within its discretion in suspending Pattis from the practice of law for a period of two weeks.

The writ of error is denied.

In this opinion the other judges concurred.